1:21−cv−00789 (TJM/CFH)

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALYSSA ROSE, MYJORIE PHILIPPE, VANESSA INOA, and MELISSA SISK, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br> v.<br><br>BEECH-NUT NUTRITION COMPANY,<br><br><br>    Defendant. | **CLASS ACTION COMPLAINT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

   Plaintiffs Alyssa Rose, Myjorie Philippe, Vanessa Inoa, and Melissa Sisk ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this class action suit for damages and equitable relief against Defendant Beech-Nut Nutrition Company ("Beech-Nut" or "Defendant"). Plaintiffs allege the following based upon personal information as to allegations regarding themselves, on the investigation of their counsel, and on information and belief as to all other allegations:

### <u>NATURE OF THE ACTION</u>

   1.  Plaintiffs bring this class action on behalf of themselves and other all other parents and persons nationwide who bought Defendant's baby food products containing harmful heavy metals such as inorganic arsenic, lead, cadmium, and mercury.  The products at issue include, but are not limited to, the following: Beech-Nut's Rice Single Grain Baby Cereal, Oatmeal Whole Grain Baby

1

Cereal, Classic Sweet Carrots, Organics Just Carrots, Organics Just Pears, Organics Just Prunes, Naturals Just Sweet Potatoes, Organics Just Sweet Potatoes, Organics Banana, Classic Sweet Potatoes, Classic Sweet Peas, Naturals Just Butternut Squash, Organics Just Pumpkin, Organics Banana, Mango & Sweet Potato, Organics Banana, Cinnamon & Granola, Organics Just Apples, Naturals Bananas, Naturals Beets, Pear & Pomegranate, Classic Mixed Vegetables, Classic Chicken & Chicken Broth, Classic Turkey & Turkey Broth, and Breakfast On-the-Go Yogurt, Banana & Mixed Berry Blend (referred to herein as "Beech-Nut Products").[1]

2.      Numerous scientific studies conducted over the last several decades have confirmed that inorganic arsenic, lead, cadmium, and mercury are developmental neurotoxins that are harmful to a baby's developing brain and nervous system.  There are no established safe levels of these substances for baby foods.

3.      Babies and children who consume inorganic arsenic, lead, cadmium, or mercury are at risk of suffering health problems, a loss of intellectual capacity and behavioral problems such as attention-deficit/hyperactivity disorder ("ADHD"), among other things.  Even the consumption of small amounts over time can increase the risk of bladder, lung and skin cancer, and Type 2 Diabetes.  Moreover, medical professionals and scientists alike agree that early exposure to heavy metals can have long-term effects that are irreversible.

4.      On February 4, 2021, the U.S. House of Representatives Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform issued a detailed report titled, *Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* ("Report").  The Report revealed that some of the largest baby food manufacturers in an industry that generates over $50 billion annually in sales knowingly distributed and sold baby food containing harmful heavy metals such as inorganic arsenic, lead, cadmium, and mercury.  Beech-Nut was identified as one of four companies knowingly selling baby foods containing harmful heavy metals.

5.      On June 8, 2021, Beech-Nut issued a voluntary recall of certain of its rice cereal products based on the State of Alaska's findings that Beech-Nut's products tested above the guidance

---

[1] Plaintiffs reserve the right to expand the list of Beech-Nut Products specifically identified herein as their investigation continues and/or they have had an opportunity to conduct discovery.

level for naturally occurring inorganic arsenic of 100 ppb set by the Food and Drug Administration in 2020. Beech-Nut also announced that it was exiting the market for infant rice cereal foods based on its inability to consistently use rice flour below the 100 ppb of inorganic arsenic set by the FDA.

6.      Beech-Nut manufactures, warrants, advertises, and sells the Beech-Nut Products as being suitable and safe for consumption by babies. Beech-Nut uniformly states that its products are food for babies and disclaims the use of unwanted ingredients. Beech-Nut's food labeling and statements, taken together and considered as a whole, from the perspective of a reasonable consumer, conveyed that the Beech-Nut Products are safe and suitable for consumption by babies.

7.      As alleged herein, Defendant's marketing and advertising of its products is false, deceptive, and misleading to reasonable consumers because Defendant knows that heavy metals are harmful to babies yet sold products containing harmful heavy metals as evidenced by its own testing. Defendant's marketing and advertising of its products is also false, deceptive, and misleading to reasonable consumers because Defendant failed to warn and disclose material facts regarding its products, namely, that they were unsafe and unsuitable for babies; that they contained heavy metals; the levels of the heavy metals; that their internal testing showed that their products contained harmful heavy metals; and that their internal policies permitted the sale of baby food products with harmful heavy metals. The Defendant's distribution and sale of these products was unlawful, unfair, false, and misleading, and the Defendant was unjustly enriched at the expense of Plaintiffs and Class members.

8.      Plaintiffs and Class members would not have purchased the Beech-Nut Products, or would have paid less, had they known that the products were unsafe and unsuitable for babies; that they contained heavy metals or the levels of heavy metals; that Defendant's testing showed that its products contained harmful heavy metals; or that its policies permitted the sale of baby food products with harmful levels of heavy metals.

9.      Plaintiffs bring this action and assert claims on behalf of themselves and all other similarly situated persons (defined below) for breach of the implied warranty of merchantability, fraud, deceptive, false, and misleading advertising and business practices, and unjust enrichment.

**JURISDICTION AND VENUE**

10.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act,

28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs; the number of members of the proposed Class exceeds 100; and many members of the proposed Class are citizens of different states than the Defendant.

11.     This Court has personal jurisdiction over Defendant Beech-Nut Nutrition Company because Defendant is headquartered in the State of New York, regularly conducts business in this Judicial District, and has extensive contacts with this forum.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Defendant transacts substantial business in this District.

13.     This Court has supplemental jurisdiction over the state law claims, pursuant to 28 U.S.C. § 1367.

## THE PARTIES

### Plaintiffs

14.     Plaintiff Alyssa Rose is a resident and citizen of Pennsylvania. Plaintiff Rose has bought Beech-Nut's baby food products, including Beech-Nut's Rice Single Grain Baby Cereal, Classic Sweet Carrots, Organics Just Carrots, Naturals Just Sweet Potatoes, Organics Just Sweet Potatoes, Classic Sweet Potatoes, Naturals Just Butternut Squash, Organics Just Apples, Naturals Bananas, and Classic Mixed Vegetables, from Walmart and Giant Food retail stores in various locations around her home in Aston, Pennsylvania.  Plaintiff Rose regularly purchased these products since 2017 and reviewed and relied on the representations on the packaging and believed the products to be safe and suitable for babies.  Plaintiff Rose's purchases took place during a time in which third-party testing showed that the Beech-Nut's Products contained harmful heavy metals.  If Plaintiff Rose had known that the products were unsafe and unsuitable for babies; that they contained heavy metals; the levels of the heavy metals; that testing showed that these products contained harmful heavy metals; that Defendant did not regularly test finished products for heavy metals; or that the Defendant's policies permitted the sale of products with harmful levels of heavy metals, Plaintiff Rose would not have purchased the products or would have paid less for them.

15.     Plaintiff Myjorie Philippe is a resident and citizen of Massachusetts. Plaintiff Philippe has bought Beech-Nut's baby food products, including Beech-Nut's Rice Single Grain Baby Cereal,

Oatmeal Whole Grain Baby Cereal, Organics Just Carrots, Naturals Just Sweet Potatoes, Organics Just Sweet Potatoes, Naturals Just Butternut Squash, Organics Just Pumpkin, Organics Just Apples, from Shaw's, Target, Whole Foods, and Market Basket retail stores in various locations in Massachusetts, including Marlborough, Groton, Leominster, Hudson, Shrewsbury, and Worcester. Plaintiff Philippe regularly purchased these products since 2017, reviewed and relied on the representations on the packaging, and believed the products to be safe and suitable for babies. Plaintiff Philippe's purchases took place during a time in which third-party testing showed that the Beech-Nut's Products contained harmful heavy metals. If Plaintiff Philippe had known that the products were unsafe and unsuitable for babies; that they contained heavy metals; the levels of the heavy metals; that testing showed that these products contained harmful heavy metals; that Defendant did not regularly test finished products for heavy metals; or that the Defendant's policies permitted the sale of products with harmful levels of heavy metals, Plaintiff Philippe would not have purchased the products or would have paid less for them.

16.     Plaintiff Vanessa Inoa is a resident and citizen of Florida. Plaintiff Inoa has bought Beech-Nut's baby food products, including Beech-Nut's Rice Single Grain Baby Cereal, Oatmeal Whole Grain Baby Cereal, Organics Just Prunes, Organics Just Sweet Potatoes, Organics Just Pears, Organics Banana, Cinnamon, & Granola, Organics Banana, Mango, & Sweet Potato, from Walmart and Target retail stores in various locations in Florida, including St. Cloud and Kissimmee. Plaintiff Inoa regularly purchased these products starting in 2019, reviewed and relied on the representations on the packaging, and believed the products to be safe and suitable for babies. Plaintiff Inoa's purchases took place during a time in which third-party testing showed that Beech-Nut's Products contained harmful heavy metals. If Plaintiff Inoa had known that the products were unsafe and unsuitable for babies; that they contained heavy metals; the levels of the heavy metals; that testing showed that these products contained harmful heavy metals; that Defendant did not regularly test finished products for heavy metals; or that the Defendant's policies permitted the sale of products with harmful levels of heavy metals, Plaintiff Inoa would not have purchased the products or would have paid less for them.

17.     Plaintiff Melissa Sisk is a resident and citizen of New Jersey. Plaintiff Sisk has bought Beech-Nut's baby food products, including Beech-Nut's Rice Single Grain Baby Cereal, from Stop N'

Shop and Walmart, retail stores in various locations in Toms River Township, New Jersey. Plaintiff Sisk regularly purchased these products starting in 2020, reviewed and relied on the representations on the packaging, and believed the products to be safe and suitable for babies. If Plaintiff Sisk had known that the products were unsafe and unsuitable for babies; that they contained heavy metals; the levels of the heavy metals; that testing showed that these products contained harmful heavy metals; that Defendant did not regularly test finished products for heavy metals; or that the Defendant's policies permitted the sale of products with harmful levels of heavy metals, Plaintiff Sisk would not have purchased the products or would have paid less for them.

**Defendant**

18.     Defendant Beech-Nut Nutrition Company is a citizen of New York, where it is incorporated and maintains its principal place of business at One Nutrition Place, Amsterdam, New York. Defendant does business throughout the United States. Defendant's baby food products are sold throughout the United States at large and small brick-and-mortar stores and online retailers.

**FACTUAL ALLEGATIONS**

**There are No Established Safe Levels of Heavy Metals in Baby Food in the U.S.**

19.     According to the U.S. House of Representatives' Report, "Children's exposure to toxic heavy metals causes permanent decreases in IQ, diminished future economic productivity, and increased risk of future criminal and antisocial behavior."  The Report highlights numerous studies conducted over the last several decades analyzing the effects of early exposure of heavy metals and concluding that the harm is long-standing and irreversible.

20.     Babies are particularly vulnerable to the effects from exposure to heavy metals because they are small, and their organs are developing.  Specifically, exposure to heavy metals during a baby's developmental stage can lead to "'untreatable and frequently permanent' brain damage, which may result in 'reduced intelligence, as expressed in terms of lost IQ points, or disruption in behavior.'"[2]  According to Tom Neltner, chemical policy director for the Environmental Defense Fund ("EDF") which has studied lead in food for 25 years, "Exposure to these toxic heavy metals affects

_____

[2] Report at page 9.

babies' brain development and nervous system, it affects their behavior, permanently decreases IQ, and, if you want to boil it down to dollars, their lifetime earnings potential."

21.     A published study titled, *A Strategy for Comparing the Contributions of Environmental Chemicals and Other Risk Factors to Neurodevelopment of Children*, found that exposure to heavy metals such as lead are "associated with 40,131,518 total IQ point loss in 25.5 million children (or roughly 1.57 lost IQ points per child)—more than the total IQ losses associated with preterm birth (34,031,025), brain tumors (37,288) and traumatic brain injury (5,827,300) combined."[3]

22.     The Food and Drug Administration ("FDA") has concluded that inorganic arsenic, lead, cadmium, and mercury are hazardous to babies and children and have "no established health benefit" and "lead to illness, impairment, and in high doses, death."  Further, even low levels of these heavy metals are concerning to health and well-being.

**Inorganic Arsenic**

23.     The consumption of arsenic can result in serious and life-threatening health problems. The Department of Health and Human Services' Agency for Toxic Substances and Disease Registry ("ATSDR") has ranked arsenic as the number one substance present in the environment that poses the most significant threat to human health.  The known health risks resulting from arsenic exposure include "respiratory, gastrointestinal, haematological, hepatic, renal, skin, neurological and immunological effects, as well as damaging effects on the central nervous system and cognitive development in children."[4]

24.     There is no established safe level of inorganic arsenic for baby foods.  Consumer advocacy groups like Healthy Babies Bright Futures has advocated that there should be no measurable amount of inorganic arsenic in baby food, while Consumer Reports has advocated for a limit of 3 parts per billion ("ppb").

25.     For bottled water, the FDA has set a maximum level of arsenic at 10 ppb, while the Environmental Protection Agency ("EPA") and the World Health Organization ("WHO") have set a

---

[3] *Id.*

[4] Miguel Rodriguez-Barranco, et al., *Association of Arsenic, Cadmium and Manganese Exposure with Neurodevelopment and Behavioral Disorders in Children: A Systematic Review and Met-Analysis* (June 1, 2013) (https://pubmed.ncbi.nlm.nih.gov/23570911) (last visited Feb. 10, 2021).

similar limit for drinking water.

26.     With regard to baby rice cereal, the FDA in August 2020 issued guidance setting the maximum threshold of inorganic arsenic at 100 ppb.  When the FDA issued this guidance, however, its focus was on the amount of inorganic arsenic that would cause cancer, not on neurological damage which can occur at lower levels.

27.     Several studies have found that arsenic has a significant negative effect on neurodevelopment in children, primarily in IQ levels.  For example, a study of schoolchildren in Maine who drank water with an arsenic concentration level of more than 5 ppb showed significant decreases in "Full Scale IQ, Working Memory, Perceptional Reasoning and Verbal Comprehension scores."[5]

28.     Another study of children in Spain concluded that an increase in arsenic exposure resulted in a reduction of a child's global, gross, and fine motor function scores, and that boys were more susceptible to the neurotoxicity of arsenic.[6]

**Lead**

29.     According to the FDA, lead has no established health benefit.  Lead is the second substance, after arsenic, on the ATSDR's list of substances present in the environment potentially posing a significant threat to human health.  The consumption of low levels of lead from food and other sources has been found to contribute to 400,000 deaths every year.

30.     The Environmental Protection Agency ("EPA"), the Centers for Disease Control and Prevention ("CDC") and the American Academy of Pediatrics ("AAP") unanimously agree that there is no established "safe level of lead (Pb) in a child's blood; even low levels of Pb in the blood can result in behavior and learning problems, lower IQ and hyperactivity, slowed growth, hearing

---

[5] Gail A. Wasserman, et al., *A Cross-Sectional Study of Well Water Arsenic and Child IQ in Maine Schoolchildren* (Apr. 1, 2014) (https://ehjournal.biomedcentral.com/articles/10.1186/1476-069X-13-23) (last visited Feb. 11, 2021).

[6] Antonio J. Signes-Pastor, et al., *Inorganic Arsenic Exposure and Neuropsychological Development of Children of 4-5 Years of Age Living in Spain* (Apr. 29, 2019) (www.ncbi.nlm.nih.gov/pmc/articles/PMC6541502/) (last visited Feb. 11, 2021).

problems, and anemia."[7] Consistent with this assessment, the AAP and the Environmental Defense Fund have proposed a maximum of 1 ppb of lead in food for babies and children.

31.     The FDA has established a maximum daily intake of lead from food (called the Interim Reference Level) of 3 μg (or 3 ppb) for kids and 12.5 μg (or 12.5 ppb) for women of childbearing age. The consumer organization Healthy Babies Bright Future has advocated for a standard of zero lead in baby food while Consumer Reports advocates for no more than 1 ppb of lead in foods and drinks for babies and children.

32.     Outside the food context, the FDA has set a maximum limit on lead of 5 ppb for bottled water.  The EPA has set an action level of 15 ppb of lead for drinking water while the WHO has set 10 ppb as a provisional guideline.

33.     Studies have shown that even low levels of lead exposure can have a negative impact on children.  In two different studies of schoolchildren in Detroit and Chicago public schools, a significant inverse relationship was found between lead exposure and test scores.  The Detroit study, in particular, found a strong correlation between early childhood lead exposure and reduced standardized test performance.[8]  In the Chicago study, higher blood level concentrations were linked to lower reading and math scores in third-grade children, with a substantial 32% increase in failing reading and math.[9]

34.     Early childhood lead exposure can result in permanent cognitive effects, as one study showed.  In that study, adults who had developmental delays associated with lead exposure continued to show cognitive deficits.[10]

---

[7] Valerie Zartarian, et al., *Children's Lead Exposure: A Multimedia Modeling Analysis to Guide Public Health Decision-Making* (Sept. 12, 2017) (https://ehp.niehs.nih.gov/doi/10.1289/ehp1605) (last visited Feb. 11, 2021).

[8] Nanhua Zhang, et al., *Early Childhood Lead Exposure and Academic Achievement: Evidence From Detroit Public Schools* (Mar. 2013) (https://pubmed.ncbi.nlm.nih.gov/23327265/) (last visited Feb. 11, 2021).

[9] Anne Evens, et al., *The Impact of Low-Level Lead Toxicity on School Performance Among Children in the Chicago Public Schools: A Population-Based Retrospective Cohort Study* (Apr. 7, 2015) (https://ehjournal.biomedcentral.com/articles/10.1186/s12940-015-0008-9) (last visited Feb. 11, 2021).

[10] Maitreyi Mazumdar, et al., *Low-Level Environmental Lead Exposure in Childhood and Adult Intellectual Function: A Follow-Up Study* (Mar. 30, 2011) (www.ncbi.nlm.nih.gov/pmc/articles/PMC3072933/) (last visited Feb. 11, 2021).

35.     Several studies have also established a strong link between lead exposure and ADHD.[11]

36.     Jay Schneider, Ph.D., a professor of anatomy, pathology, and cell biology at Thomas Jefferson University in Philadelphia, has examined hundreds of children with lead exposure and believes that even the tiniest amounts of lead in children's food should be avoided.

### Cadmium

37.     The ATSDR identifies cadmium as number seven on its list of substances present in the environment that potentially poses a significant threat to human health.  Cadmium, like inorganic arsenic, has been shown to affect a child's IQ level and the development of ADHD.

38.     Several federal and state agencies have regulated cadmium.  Pursuant to Proposition 65, California has identified cadmium as causing developmental and male reproductive toxicity and has set an oral Maximum Allowable Dose Level ("MADL") of 4.1 µg (or 4.1 ppb) per day.

39.     The FDA and EPA have set a maximum allowable limit of cadmium of 5 ppb in bottled water and drinking water.  The World Health Organization ("WHO") has set a maximum allowable limit of cadmium in drinking water at 3 ppb.

40.     Consumer groups have advocated for even stricter levels of cadmium in foods.  For example, Healthy Babies Bright Futures has advocated that no measurable amount of cadmium should be in baby foods, while Consumer Reports has advocated for a limit of 1 ppb of cadmium in fruit juices.

41.     A study examining the effect of cadmium exposure on children concluded that it negatively impacted Full Scale IQ and in particular, boys.  According to the 2018 study, boys "exhibiting higher amounts of cadmium exposure had seven fewer IQ points than those exhibiting less cadmium exposure."[12]

42.     Another 2018 study found a link between cadmium exposure and ADHD and concluded that ADHD was more prevalent among children with the high cadmium exposure as

---

[11] Gabriele Donzelli, et al., *The Association Between Lead and Attention-Deficit/Hyperactivity Disorder: A Systematic Review* (Jan. 29, 2019) ([www.mdpi.com/1660-4601/16/3/382/htm](www.mdpi.com/1660-4601/16/3/382/htm)).

[12] Report at 12 (citing Klara Gustin, et al., *Cadmium Exposure and Cognitive Abilities and Behavior at 10 Years of Age: A Prospective Cohort Study* (Apr. 2018) (https://pubmed.ncbi.nlm.nih.gov/29459184/) (last visited Feb. 11, 2021).

compared to the control group.[13]

## Mercury

43.     Mercury is the number three substance on ATSDR's list of substances in the environment potentially posing a significant threat to human health.

44.     As with inorganic arsenic, lead, and cadmium, Healthy Babies Bright Futures advocates for a goal of zero levels of mercury in baby food.  Outside the baby food context, the FDA has set a limit of 2 ppb of mercury in bottled water, while the EPA has set a limit of 2 ppb for drinking water.

45.     Mercury's effect on children's development has been studied in the context of a pregnant woman's exposure to mercury.  Pre-natal "mercury exposure has been consistently associated with adverse subsequent neuro-development."[14]

## THE BEECH-NUT PRODUCTS

## Beech-Nut Represented that its Beech-Nut Products are Safe and Suitable for Babies

46.     Beech-Nut manufacturers, distributes, and sells food for babies under the brand name Beech-Nut.  To gain the trust of the consuming public, Beech-Nut paints itself as a company that, since 1931, has offered real food for babies that is healthier and undergoes rigorous testing for harmful ingredients.   According to its website at www.beechnut.com, Defendant promises that "Making high quality, safe, and nutritious foods for babies and toddlers will always be our #1 priority."

47.     Defendant uniformly markets, advertises, represents, and warrants the Beech-Nut Products as safe and suitable for consumption by babies.

48.     Regarding the Beech-Nut Rice Single Grain Baby Cereal, Beech-Nut represents that the cereal is for babies four months and over.  On the back of the label, Defendant again represents that the food is for babies and that it does not contain harmful ingredients, such as BPA.  Defendant's labeling and statements, taken together and considered as a whole, from the perspective of a reasonable consumer, conveyed that the Beech-Nut Rice Single Grain Baby Cereal products are safe

---

[13] Min-Jing Lee, et al., *Heavy Metals' Effects on Susceptibility to Attention-Deficit/Hyperactivity Disorder: Implication of Lead, Cadmium, and Antimony* (June 10, 2018) (https://pubmed.ncbi.nlm.nih.gov/29890770/) (last visited Feb. 11, 2021).

[14] Margaret R. Karagas, et al., *Evidence on the Human Health Effects of Low-Level Methylmercury Exposure* (June 1, 2012) (https://pubmed.ncbi.nlm.nih.gov/22275730/) (last visited Feb. 11, 2021).

and suitable for consumption by babies.

49.     Below are examples of the front and back labels of the Beech-Nut Rice Single Grain

Baby Cereal:



50.     Defendant also offers baby food in jars that are simply designed to convey that they

contain wholesome and pure ingredients.  Regarding the Classic Sweet Carrots baby food, on the front

of the jar, Beech-Nut says that the product is for babies six months or over and around the lid of the

jar, Beech-Nut repeatedly states that nothing artificial is added.

51.     Below are examples of the front and back labels of the Beech-Nut Classic Sweet Carrots baby food:



52.     As to the Beech-Nut Naturals Just Sweet Potatoes, on the front of the jar Beech-Nut says the product is for babies who are four months or older and around the lid of the jar, Beech-Nut repeatedly states "real food for babies."

53.     Below are examples of the front and back labels of the Beech-Nut Naturals Just Sweet Potatoes:



54.     Regarding the Classic Mixed Vegetables, on the front of the jar, Beech-Nut says it is for babies six months or older and around the lid of the jar, Beech-Nut repeatedly states that the food has "nothing artificial added."

55.     Below are examples of the front and back labels of the Beech-Nut Classic Mixed Vegetables product:




**Beech-Nut Knowingly Sold Unsafe, Finished Baby Foods Containing Heavy Metals**

56.     The congressional report released on February 4, 2021, also identified Beech-Nut as a company that knowingly sold baby food products with ingredients testing high in toxic heavy metals. Beech-Nut indicated that it did not test final products, but instead only ingredients.

57.     According to the Report, internal testing documents show that "Beech-Nut used ingredients after they tested as high as 913.4 ppb arsenic" and "routinely used high-arsenic additives that tested over 300 ppb arsenic to address product characteristics such as "crumb softness."[15]

58.     In particular, internal documents show that the ingredient "Rice Flour," which Beech-Nut uses in the Beech-Nut Rice Single Grain Baby Cereal, repeatedly tested over 100 ppb and sometimes as high as 170 ppb. Worse, it appears that Beech-Nut set a limit of 100 ppb and instead of rejecting the ingredients that tested above that level, Beech-Nut used them.  Other ingredients that Beech-Nut used in its baby food products, such as Amylase, BAN 800, Alpha Amylase and Sebamyl 100, are enzymes that tested in the range of 353 ppb to 913.40 ppb arsenic.

59.     Although there is no established safe limit for lead in baby food, Beech-Nut used ingredients testing at extremely high lead levels, such as 886.9 ppb.  According to the Report, Beech-Nut used 57 ingredients that contained over 20 ppb lead, which is four times the limit the FDA has set for bottled water.  For example, in testing commissioned by Healthy Babies Bright Futures, the Classics Sweet Carrots contained 27.2 ppb lead, while the Naturals Just Sweet Potatoes contained 14.1 ppb lead and the Classic Mixed Vegetables contained 17.9 ppb lead.

60.     Regarding cadmium, Beech-Nut used ingredients testing at over 100 ppb, which is 20 times more than the limit for bottled water.  Testing commissioned by Healthy Babies Bright Futures shows that the Beech-Nut Products tested for cadmium in harmful levels.

61.     Internal documents identified in the Report show that Beech-Nut did not even test its baby food products for mercury, while the Health Babies Bright Future showed that they did contain mercury.

62.     All the Beech-Nut Products specified herein, and others, have tested positive for

---

[15] Report at 3.

harmful toxic heavy metals.

63.     Despite touting itself as a company that prioritizes making safe and nutritious baby food, and conveying through statements on product labeling that the Beech-Nut Products are safe and suitable for babies, Beech-Nut sold food products that were unsafe for babies and also failed to warn and disclose material facts, including that its products contained harmful heavy metals, including inorganic arsenic, lead, cadmium, and/or mercury.

### Beech-Nut's Voluntary Recall and Exit from the Infant Rice Cereal Market

64.     About four months after the Congressional Report became public, on June 8, 2021, Beech-Nut issued a voluntary recall of a lot of its Stage 1, Single Grain Rice Cereal for infants.

65.     The catalyst that drove Beech-Nut's recall was routine sampling conducted by the State of Alaska which showed that Beech-Nut Stage 1, Single Grain Rice Cereal products exceeded the 100 ppb limit for inorganic arsenic set by the FDA.

66.     At the same time that Beech-Nut issued the voluntary recall, it also announced that it was exiting the market for infant rice cereal and instructed that all stores remove Beech-Nut Rice Infant Cereal from store shelves.  Beech-Nut also instructed that the recalled products should be discarded.

67.     Beech-Nut's exit from the infant rice cereal market is not a surprise considering that its own testing revealed that ingredients it used in baby food products tested as high as 913 ppb for inorganic arsenic.

68.     Beech-Nut said it made the decision to exit the infant rice cereal market out of concern "about the ability to consistently obtain rice flour well-below the FDA guidance level and Beech-Nut specifications for naturally occurring inorganic arsenic[.]"

### CLASS ACTION ALLEGATIONS

69.     Plaintiffs bring this action on behalf of themselves and on behalf of the following proposed Class initially defined as follows: All persons residing in the United States who purchased for personal, family, or household use, between 2017 to the present, one or more Beech-Nut Products ("National Class").

70.     Plaintiff Philippe also brings this action on behalf of herself and a Massachusetts

State Class defined as follows: All persons residing in Massachusetts who purchased for personal, family, or household use, between 2017 to the present, one or more Beech-Nut Products ("Massachusetts State Class").

71.     Plaintiff Rose also brings this action on behalf of herself and a Pennsylvania State Class defined as follows: All persons residing in Pennsylvania who purchased for personal, family, or household use, between 2017 to the present, one or more Beech-Nut Products ("Pennsylvania State Class").

72.     Plaintiff Inoa also brings this action on behalf of herself and a Florida State Class defined as follows: All persons residing in Florida who purchased for personal, family, or household use, between 2017 and the present, one or more Beech-Nut Products ("Florida State Class").

73.     Plaintiff Sisk also brings this action on behalf of herself and a New Jersey State Class defined as follows: All persons residing in New Jersey who purchased for personal, family, or household use, between 2017 and the present, one or more Beech-Nut Products ("New Jersey State Class").

74.     Excluded from the proposed National Class, the Massachusetts State Class, the Pennsylvania State Class, the Florida State Class, and the New Jersey State Class, are Defendant, its parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendant has a controlling interest.

75.     Plaintiffs reserve the right to re-define any of the Class definitions prior to class certification and after having the opportunity to conduct discovery.

76.     This action has been properly brought and may properly be maintained as a class action under Rule 23(a)(1-4), Rule 23(b)(1), (2), or (3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure.

<u>**Numerosity of the Proposed Class**</u>

**(Fed. R. Civ. P. 23(a)(1))**

77.     The members of the Class are so numerous that their individual joinder would be impracticable. The Class comprises at least hundreds of thousands of consumers. The precise number of Class members, and their addresses, are unknown to Plaintiffs at this time, but can be ascertained

17

from Defendant's records and/or retailer records. The members of the Class may be notified of the pendency of this action by mail or email, supplemented (if deemed necessary or appropriate by the Court) by published notice.

## Predominance of Common Questions of Fact and Law

### (Fed. R. Civ. P. 23(a)(2); 23(b)(3))

78.     Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting only individual members of the Class. The common legal and factual questions include, without limitation:

(a)     Whether Defendant knew its products contained harmful heavy metals that rendered their baby food products unsafe for babies;

(b)     Whether Defendant's affirmative representations about its products, when considered as a whole, were false and misleading to reasonable consumers because the products were unsafe for babies, contained harmful heavy metals as Defendant's internal testing showed, and because Defendant's internal policies permitted the sale of the products with harmful levels of heavy metals;

(c)     Whether Defendant failed to warn and disclose material facts regarding its products, namely, that they were unsafe for babies; that they contained heavy metals or the level of heavy metals; that the Defendant's testing showed that its products contained harmful heavy metals; and that the Defendant's policies permitted the sale of the products with harmful levels of heavy metals;

(d)     Whether Defendant violated the state consumer protection statutes alleged herein;

(e)     Whether Defendant was unjustly enriched; and

(f)     The nature of the relief, including damages and equitable relief, to which Plaintiffs and the members of the Class are entitled.

## Typicality of Claims

### (Fed. R. Civ. P. 23(a)(3))

79.     Plaintiffs' claims are typical of the claims of the Class because Plaintiffs, like all other Class members, purchased Defendant's products, suffered damages as a result of that purchase, and seek the same relief as the proposed Class members.

## Adequacy of Representation

### (Fed. R. Civ. P. 23(a)(4))

80.     Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class, and they have retained counsel competent and experienced in complex class action and consumer litigation.

81.     Plaintiffs and their counsel will fairly and adequately protect the interest of the members of the Class.

## Superiority of a Class Action

### (Fed. R. Civ. P. 23(b)(3))

82.     A class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and members of the Class.  There is no special interest in Class members individually controlling the prosecution of separate actions.  The damages suffered by individual members of the Class, while significant, are small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. Further, it would be virtually impossible for the members of the Class individually to redress effectively the wrongs done to them. And, even if members of the Class themselves could afford such individual litigation; the court system could not, given the thousands or even millions of cases that would need to be filed. Individualized litigation would also present a potential for inconsistent or contradictory judgments. Individualized litigation would increase the delay and expense to all parties and the court system, given the complex legal and factual issues involved. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**Risk of Inconsistent or Dispositive Adjudications and the Appropriateness
of Final Injunctive or Declaratory Relief**

**(Fed. R. Civ. P. 23(b)(1) and (2))**

83.     In the alternative, this action may properly be maintained as a class action, because:

(a)     the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members, which would establish incompatible standards of conduct for Defendant; or

(b)     the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

(c)     Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

**Issue Certification**

**(Fed. R. Civ. P. 23(c)(4))**

84.     In the alternative, the common questions of fact and law, set forth in Paragraph 78, are appropriate for issue certification on behalf of the proposed Class.

**FIRST CAUSE OF ACTION**

**Violations of the Massachusetts Consumer Protection Law
(Mass. Gen. Laws, Ch. 93A)
(On Behalf of Plaintiff Philippe and the Massachusetts State Class)**

85.     Plaintiff Philippe hereby incorporates all other paragraphs of this Complaint and restate them as if fully set forth herein.

86.     Plaintiff Philippe brings this claim on behalf of herself and the Massachusetts State Class against Defendant Beech-Nut.

87.     Defendant, Plaintiff Philippe, and the Massachusetts State Class are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

88.     Defendant engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

89.     Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2. Defendant participated in misleading, false, or deceptive acts that violated the Massachusetts Act.

90.     In the course of business, Defendant made affirmative misrepresentations that conveyed to Plaintiff Philippe and to the Massachusetts State Class members that the Beech-Nut's Products were safe and suitable for babies. Defendant, however, concealed and suppressed material facts concerning the Beech-Nut's Products, including that the Beech-Nut Products were unsafe and unsuitable for babies; that they contained heavy metals; the level of the heavy metals; that internal testing showed that the Beech-Nut Products contained harmful heavy metals; that Defendant did not regularly test finished products for heavy metals; and that Defendant's policies permitted the sale of products with harmful levels of heavy metals.

91.     Plaintiff Philippe and Massachusetts State Class members had no way of discerning that Defendant's representations were false and misleading because Plaintiff Philippe and Massachusetts State Class members did not have access to Defendant's internal testing, internal policies, or any internal documents showing the presence of harmful heavy metals.

92.     Defendant thus violated the Act by making statements, when considered as a whole from the perspective of the reasonable consumer, that conveyed that the Beech-Nut Products were safe and suitable for babies. Defendant also failed to disclose and warn that the Beech-Nut Products were unsafe and unsuitable for children; that they contained heavy metals; the level of the heavy metals; that internal testing showed that the products contained harmful heavy metals; that Defendant did not regularly test finished products for heavy metals; and that Defendant's policies permitted the sale of products with harmful levels of heavy metals.

93.     Defendant intentionally and knowingly misrepresented material facts regarding the Beech-Nut Products with intent to mislead Plaintiff Philippe and the Massachusetts State Class.

94.     Defendant knew or should have known that their conduct violated the Massachusetts Act.

95.     Defendant owed Plaintiff Philippe and the Massachusetts State Class a duty to disclose the true and unsafe nature of the Beech-Nut Products.

96.     Defendant's concealment of the true characteristics of the Beech-Nut Products was material to Plaintiff Philippe and to the Massachusetts State Class.

97.     Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Philippe and the Massachusetts State Class, about the true nature of the Beech-Nut Products.

98.     Plaintiff Philippe and the Massachusetts State Class would not have purchased the Beech-Nut Products, or would have paid less, had they known that the products were unsafe and unsuitable for babies; that they contained heavy metals or the levels of heavy metals; that Defendant's testing showed that its products contained harmful heavy metals; that Defendant did not regularly test finished products for heavy metals; or that Defendant's policies permitted the sale of products with harmful levels of heavy metals.

99.     Defendant's violations present a continuing risk to the Massachusetts State Class as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

100.    Plaintiff Philippe and the Massachusetts State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's misrepresentations and concealment of and failure to disclose material information. Defendant had an ongoing duty to all its customers to refrain from unfair and deceptive practices under the Massachusetts Act. Plaintiff Philippe and the Massachusetts State Class suffered ascertainable loss as a result of Defendant's deceptive and unfair acts and practices made in the course of Defendant's business.

101.    As a direct and proximate result of Defendant's violations of the Massachusetts Act, Plaintiff Philippe and the Massachusetts State Class have suffered injury-in-fact and/or actual damage.

102.    Pursuant to Mass. Gen. Laws ch. 93A, § 9, Plaintiff Philippe and the Massachusetts State Class seek monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Massachusetts State Class member. Because Defendant's conduct was committed willfully and

knowingly, each Massachusetts State Class member is entitled to recover up to three times actual damages, but no less than two times actual damages.

103.    Plaintiff Philippe and the Massachusetts State Class also seek an order enjoining Defendant's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts Act.

104.    Pursuant to Mass. Gen. Laws, Ch. 93A § 9(3), on May 11, 2021, Defendant was provided with a written demand for relief. Additionally, Defendant was provided notice of the issues raised in this cause of action and this Complaint. Plaintiff Philippe and the Massachusetts State Class seek all damages and relief to which it is entitled.

105.    As a result of Defendant's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## SECOND CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability
### Mass. Gen. Laws c. 106 § 2-314
### (On Behalf of Plaintiff Philippe and the Massachusetts State Class)

106.    Plaintiff Philippe hereby incorporates all other paragraphs of this Complaint and restates them as if fully set forth herein.

107.    Plaintiff Philippe brings this claim on behalf of herself and the Massachusetts State Class against Defendant Beech-Nut.

108.    Beech-Nut is and was at all relevant times a "merchant" with respect to Beech-Nut Products under M.G.L c. 106 § 2-104(1) and is a "seller" of Beech-Nut Products under § 2-103(1)(d).

109.    The Beech-Nut products are and were at all relevant times "goods" within the meaning of M.G.L. c. 106 § 2-105(1).

110.    A warranty that the Beech-Nut Products were in merchantable condition and fit for the ordinary purpose for which baby food products are used is implied by law pursuant to M.G.L. c. 106 § 2-314.

111.    The Beech-Nut Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which the Beech-Nut Products are

used. Specifically, Defendant's Beech-Nut Products are inherently defective in that they contain harmful levels of heavy metals and thus are not suitable and not safe for consumption by babies.

112.    On May 11, 2021, Defendant was provided reasonable notice of its breach and an opportunity to cure by way of a demand letter sent by Plaintiffs. Defendant was also provided notice by the numerous consumer class action complaints filed against it.

113.    As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiff Philippe and the Massachusetts State Class members have been damaged in an amount to be proven at trial.

### THIRD CAUSE OF ACTION

**Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law**
**73 P.S. § 201-1 et seq.**
**(On Behalf of Plaintiff Rose and the Pennsylvania State Class)**

114.    Plaintiff Rose hereby incorporates all other paragraphs of this Complaint and restates them as if fully set forth herein.

115.    Plaintiff Rose brings this claim on behalf of herself and the Pennsylvania State Class against Defendant Beech-Nut.

116.    Plaintiff Rose, Defendant, and the members of the Pennsylvania State Class are "persons" within the meaning of 73 P.S. § 201-2(2).

117.    The Pennsylvania Unfair Trade Practices Act ("Pennsylvania UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 P.S. § 201-3.

118.    In the course of business, Defendant made affirmative misrepresentations that conveyed to Plaintiff Rose and the Pennsylvania State Class that the Beech-Nut Products were safe and suitable for babies. Defendant, however, concealed and suppressed material facts concerning the Beech-Nut Products, including that the Beech-Nut Products were unsafe and unsuitable for babies; that they contained heavy metals; the level of the heavy metals; that internal testing showed that the Beech-Nut Products contained harmful heavy metals; that Defendant did not regularly test finished products for heavy metals; and that Defendant's policies permitted the sale of products with harmful levels of heavy metals.

24

119.     Plaintiff Rose and the Pennsylvania State Class had no way of discerning that Defendant's representations were false and misleading because Plaintiff Rose and the Pennsylvania State Class did not have access to Defendant's internal testing, internal policies, or any internal documents showing the presence of harmful heavy metals.

120.     Defendant thus violated the Act by making statements, when considered as a whole from the perspective of the reasonable consumer, that conveyed that the Beech-Nut Products were safe and suitable for babies. Defendant also failed to disclose and warn that the Beech-Nut Products were unsafe and unsuitable for children; that they contained heavy metals; the level of the heavy metals; that internal testing showed that the products contained harmful heavy metals; that Defendant did not regularly test finished products for heavy metals; and that Defendant's policies permitted the sale of products with harmful levels of heavy metals.

121.     Defendant intentionally and knowingly misrepresented material facts regarding the Beech-Nut Products with intent to mislead Plaintiff Rose and the members of the Pennsylvania State Class.

122.     Defendant knew or should have known that their conduct violated the Pennsylvania UTPA.

123.     Defendant owed Plaintiff Rose and the Pennsylvania State Class a duty to disclose the true and unsafe nature of the Beech-Nut Products.

124.     Defendant's concealment of the true characteristics of the Beech-Nut Products was material to Plaintiff Rose and the Pennsylvania State Class.

125.     Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Rose and the Pennsylvania State Class, about the true nature of the Beech-Nut Products.

126.     Plaintiff Rose and the Pennsylvania State Class would not have purchased the Beech-Nut Products, or would have paid less, had they known that the products were unsafe and unsuitable for babies; that they contained heavy metals or the levels of heavy metals; that Defendant's testing showed that its products contained harmful heavy metals; that Defendant did not regularly test finished products for heavy metals; or that Defendant's policies permitted the sale of products with harmful

levels of heavy metals.

127.    Defendant's violations present a continuing risk to Plaintiff Rose and the Pennsylvania State Class, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

128.    Plaintiff Rose and the Pennsylvania State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's misrepresentations and concealment of and failure to disclose material information. Defendant had an ongoing duty to all its customers to refrain from unfair and deceptive practices under the Pennsylvania UTPA. Plaintiff Rose and the Pennsylvania State Class suffered ascertainable loss as a result of Defendant's deceptive and unfair acts and practices made in the course of Defendant's business.

129.    As a direct and proximate result of Defendant's violations of the Pennsylvania UTPA, Plaintiff Rose and Pennsylvania State Class members have suffered injury-in-fact and/or actual damage.

130.    Pursuant to 73 P.S. § 201-9.2(a), Plaintiff Rose and the Pennsylvania State Class seek an order enjoining Defendant's unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Pennsylvania UTPA.

## FOURTH CAUSE OF ACTION

**Breach of Implied Warranty of Merchantability**
**13. Pa. Cons. Stat. § 2314**
**(On Behalf of Plaintiff Rose and the Pennsylvania State Class)**

131.    Plaintiff Rose hereby incorporates all other paragraphs of this Complaint and restates them as if fully set forth herein.

132.    Plaintiff Rose brings this claim on behalf of herself and the Pennsylvania State Class against Defendant Beech-Nut.

133.    Beech-Nut is and was at all relevant times a "merchant" with respect to Beech-Nut Products under 13 Pa. Const. Stat. § 2-104 and is a "seller" of Beech-Nut Products under § 2-103(a).

134.    The Beech-Nut products are and were at all relevant times "goods" within the meaning of 13 Pa. Const. Stat. § 2-105(a).

135.    A warranty that the Beech-Nut Products were in merchantable condition and fit for the ordinary purpose for which baby food products are used is implied by law pursuant to 13 Pa. Const. Stat. § 2-314.

136.    The Beech-Nut Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which the Beech-Nut Products are used. Specifically, Defendant's Beech-Nut Products are inherently defective in that they contain harmful levels of heavy metals and thus are not suitable and not safe for consumption by babies.

137.    On May 11, 2021, Defendant was provided reasonable notice of its breach and an opportunity to cure by way of a demand letter sent by Plaintiffs. Defendant was also provided notice by the numerous consumer class action complaints filed against it.

138.    As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiff Rose and the Pennsylvania State Class members have been damaged in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### Violations of the Florida Unfair & Deceptive Trade Practices Act
### (Fla. Stat. § 501.201 *et seq.*)
### (On Behalf of Plaintiff Inoa and the Florida State Class)

139.    Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

140.    Plaintiff Inoa brings this claim on behalf of herself and the Florida State Class against Defendant Beech-Nut.

141.    Plaintiff Inoa and members of the Florida State Class are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Fla. Stat. § 501.203(7).

142.    Defendant engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

143.    FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Fla. Stat. §

501.204(1). Defendant participated in unfair and deceptive trade practices that violated the FUDTPA as described herein.

144.     In the course of its business, Defendant made affirmative misrepresentations that conveyed to Plaintiff Inoa and to the Florida State Class members that Beech-Nut's Products were safe and suitable for babies. Defendant, however, concealed and suppressed material facts concerning Beech-Nut's Products, including that the Beech-Nut Products were unsafe and unsuitable for babies; that they contained heavy metals; the level of the heavy metals; that internal testing showed that the Beech-Nut Products contained harmful heavy metals; that Defendant did not regularly test finished products for heavy metals; and that Defendant's policies permitted the sale of products with harmful levels of heavy metals.

145.     Plaintiff and Florida State Class members had no way of discerning that Defendant's representations were false and misleading because Plaintiff and Florida State Class members did not have access to Defendant's internal testing, internal policies, or any internal documents showing the presence of harmful heavy metals.

146.     Defendant thus violated the Act by making statements, when considered as a whole from the perspective of the reasonable consumer, that conveyed that the Beech-Nut Products were safe and suitable for babies. Defendant also failed to disclose and warn that the Beech-Nut Products were unsafe and unsuitable for children; that they contained heavy metals; the level of the heavy metals; that internal testing showed that the products contained harmful heavy metals; that Defendant did not regularly test finished products for heavy metals; and that Defendant's policies permitted the sale of products with harmful levels of heavy metals.

147.     Defendant intentionally and knowingly misrepresented material facts regarding the Beech-Nut Products with intent to mislead Plaintiff Inoa and the Florida State Class.

148.     Defendant knew or should have known that their conduct violated the FUDTPA.

149.     Defendant owed Plaintiff Inoa and the Florida State Class a duty to disclose the true and unsafe nature of the Beech-Nut Products.

150.     Defendant's concealment of the true characteristics of the Beech-Nut Products was material to Plaintiff Inoa and to the Florida State Class.

151.     Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Inoa and the Florida State Class, about the true nature of the Beech-Nut Products.

152.     Plaintiff Inoa and the Florida State Class would not have purchased the Beech-Nut Products, or would have paid less, had they known that the products were unsafe and unsuitable for babies; that they contained heavy metals or the levels of heavy metals; that Defendant's testing showed that its products contained harmful heavy metals; that Defendant did not regularly test finished products for heavy metals; or that Defendant's policies permitted the sale of products with harmful levels of heavy metals.

153.     Defendant's violations present a continuing risk to the Florida State Class as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

154.     Plaintiff Inoa and the Florida State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's misrepresentations and concealment of and failure to disclose material information. Defendant had an ongoing duty to all its customers to refrain from unfair and deceptive practices under the FUDTPA. Plaintiff Inoa and the Florida State Class suffered ascertainable loss as a result of Defendant's deceptive and unfair acts and practices made in the course of Defendant's business.

155.     As a direct and proximate result of Defendant's violations of the FUDTPA, Plaintiff Inoa and the Florida State Class have suffered injury-in-fact and/or actual damage.

156.     Plaintiff Inoa and the Florida State Class are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

157.     Plaintiff Inoa and the Florida State Class also seek an order enjoining Defendant's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the FUDTPA.

### SIXTH CAUSE OF ACTION

**Violations of the New Jersey Consumer Fraud Act
(N.J. Stat. Ann. § 56:8-1, *et seq.*)
(On Behalf of Plaintiff Sisk and the New Jersey State Class)**

158.    Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

159.    Plaintiff Sisk brings this claim on behalf of herself and the New Jersey State Class against Defendant Beech-Nut.

160.    Plaintiff Sisk, Defendant, and members of the New Jersey State Class are "persons" under the New Jersey Consumer Fraud Act ("New Jersey CFA"), N.J. Stat. § 56:8-1(d).

161.    Defendant engaged in "sales" of "merchandise" within the meaning of N.J. Stat. § 56:8-1(c), (e). Defendant's actions as set forth herein occurred in the conduct of trade or commerce.

162.    The New Jersey CFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. Stat. § 56:8-2.

163.    In the course of its business, Defendant made affirmative misrepresentations that conveyed to Plaintiff Sisk and to the New Jersey State Class members that Beech-Nut's Products were safe and suitable for babies. Defendant, however, concealed and suppressed material facts concerning Beech-Nut's Products, including that the Beech-Nut Products were unsafe and unsuitable for babies; that they contained heavy metals; the level of the heavy metals; that internal testing showed that the Beech-Nut Products contained harmful heavy metals; that Defendant did not regularly test finished products for heavy metals; and that Defendant's policies permitted the sale of products with harmful levels of heavy metals.

164.    Plaintiff and New Jersey State Class members had no way of discerning that

Defendant's representations were false and misleading because Plaintiff and New Jersey State Class members did not have access to Defendant's internal testing, internal policies, or any internal documents showing the presence of harmful heavy metals.

165.    Defendant thus violated the Act by making statements, when considered as a whole from the perspective of the reasonable consumer, that conveyed that the Beech-Nut Products were safe and suitable for babies. Defendant also failed to disclose and warn that the Beech-Nut Products were unsafe and unsuitable for children; that they contained heavy metals; the level of the heavy metals; that internal testing showed that the products contained harmful heavy metals; that Defendant did not regularly test finished products for heavy metals; and that Defendant's policies permitted the sale of products with harmful levels of heavy metals.

166.    Defendant intentionally and knowingly misrepresented material facts regarding the Beech-Nut Products with intent to mislead Plaintiff Sisk and the New Jersey State Class.

167.    Defendant knew or should have known that their conduct violated the New Jersey CFA.

168.    Defendant owed Plaintiff Sisk and the New Jersey State Class a duty to disclose the true and unsafe nature of the Beech-Nut Products.

169.    Defendant's concealment of the true characteristics of the Beech-Nut Products was material to Plaintiff Sisk and to the New Jersey State Class.

170.    Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Sisk and the New Jersey State Class, about the true nature of the Beech-Nut Products.

171.    Plaintiff Sisk and the New Jersey State Class would not have purchased the Beech-Nut Products, or would have paid less, had they known that the products were unsafe and unsuitable for babies; that they contained heavy metals or the levels of heavy metals; that Defendant's testing showed that its products contained harmful heavy metals; that Defendant did not regularly test finished products for heavy metals; or that Defendant's policies permitted the sale of products with harmful levels of heavy metals.

172.    Defendant's violations present a continuing risk to the New Jersey State Class as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the

public interest.

173.    Plaintiff Sisk and the New Jersey State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's misrepresentations and concealment of and failure to disclose material information. Defendant had an ongoing duty to all its customers to refrain from unfair and deceptive practices under the New Jersey CFA. Plaintiff Sisk and the New Jersey State Class suffered ascertainable loss as a result of Defendant's deceptive and unfair acts and practices made in the course of Defendant's business.

174.    As a direct and proximate result of Defendant's violations of the New Jersey CFA, Plaintiff and the New Jersey State Class have suffered injury-in-fact and/or actual damage in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, treble damages, an order enjoining Defendant's deceptive and unfair conduct, costs and reasonable attorneys' fees under N.J. Stat. § 56:8-19, and all other just and appropriate relief.

**SEVENTH CAUSE OF ACTION**

**Unjust Enrichment**
**(On Behalf of Plaintiffs, the National Class, the Massachusetts State Class,**
**the Pennsylvania State Class, the Florida State Class, and the New Jersey State Class)**

175.    Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

176.    Plaintiffs and Class members conferred benefits upon Defendant. Plaintiffs and Class members paid money for Defendant's Beech-Nut Products that were unsafe and not suitable for babies. Defendant has unjustly retained the benefits conferred upon by Plaintiffs and Class members.

177.    Defendant retained those benefits under circumstances that make it inequitable for Defendant to retain such benefits. Among other things, Defendant failed to disclose and warn that the Beech-Nut Products were unsafe and unsuitable for children; that they contained heavy metals; the level of the heavy metals; that internal testing showed that the products contained harmful heavy metals; that Defendant did not regularly test finished products for heavy metals; and that Defendant's policies permitted the sale of products with harmful levels of heavy metals.

178.    Defendant retained those benefits even though the Beech-Nut Products contain harmful

heavy metals that render the Beech-Nut Products unsafe and unsuitable for consumption by babies. If Plaintiffs and Class members had known the true nature of the Beech-Nut Products, they would not have paid money for them or would have paid less.

179.    Plaintiffs and Class members are therefore entitled to disgorgement and/or restitution as prayed for hereunder.

## EIGHTH CAUSE OF ACTION

**Fraud**
**(Concealment and Omissions)**
**(On Behalf of Plaintiffs, the National Class, the Massachusetts State Class,**
**the Pennsylvania State Class, the Florida State Class, and the New Jersey State Class)**

180.    Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

181.    Defendant made affirmative misrepresentations, partial-truths, and purposefully concealed the true facts on each package of the Beech-Nut Products. Defendant made these misrepresentations, partial truths to, and concealed the truth from, Plaintiffs and Class members about the Beech-Nut Products knowing that the products contained harmful heavy metals, the level of heavy metals, or that internal policies permitted Defendant to sell products containing harmful heavy metals.

182.    Defendant's representations and partial truths were false. As a result of Defendant's false and misleading statements and deceptions, and omissions, Defendant achieved its desired result—to sell products that it otherwise would not have or at higher prices.

183.    Defendant knew that its misrepresentations and omissions in this regard were false and/or misleading. Defendant has been aware of the falsity and misleading nature of their affirmative misrepresentations and omissions for several years.

184.    Defendant had a duty to disclose the material facts alleged herein because it had exclusive and superior access to, and knowledge about, the levels of heavy metals in their foods and their internal testing policies and limits. Defendant also had a duty to disclose because it made affirmative representations to Plaintiffs and Class members, and the general public about the nature, quality, and characteristics of the Beech-Nut Products. Specifically, Defendant affirmatively represented that the Beech-Nut Products were suitable and safe for babies when it knew this was false

and/or misleading. This duty applied at the time Plaintiffs and Class members purchased the Beech-Nut Products, and it continues to apply today.

185.    Defendant failed to disclose and warn that the Beech-Nut Products were unsafe and unsuitable for children; that they contained heavy metals; the level of the heavy metals; that internal testing showed that the products contained harmful heavy metals; that Defendant did not regularly test finished products for heavy metals; and that Defendant's policies permitted the sale of products with harmful levels of heavy metals.

186.    Defendant intended for Plaintiffs and Class members to rely on their misrepresentations and omissions. Defendant engaged in this course of conduct to sell the Beech-Nut Products in the United States market with disregard of the unsafe nature of the products for babies. Defendant's acts were done wantonly, maliciously, oppressively, and deliberately, with the intent to defraud Plaintiffs and Class members and with reckless and conscious disregard for Plaintiffs' and Class members' rights.

187.    Defendant's misrepresentations, partial-truths, and omissions were material to Plaintiffs' and Class members' decision to buy the Beech-Nut Products. Defendant was aware—and exploited—the fact that Plaintiffs and Class members turned to Beech-Nut and trusted Beech-Nut to sell safe baby food and to disclose material facts.

188.    Plaintiffs and Class members could not have discovered the truth about the Beech-Nut Products as Defendant concealed these facts from the public until it was asked to comply with a congressional investigation and the Report became public. Plaintiffs and Class members could not have otherwise known of Defendant's scheme and ongoing deception.

189.    Plaintiffs and Class members reasonably relied on the representations and omissions in purchasing the Beech-Nut Products. Had Defendant disclosed to Plaintiffs and Class members the material facts alleged herein on the product packaging, Plaintiffs and Class members would have seen such disclosures as they relied on Defendant's representations. Further, had Plaintiffs and Class members known the truth about the Beech-Nut Products and the true characteristics of the products, they would not have acted as they did. Plaintiffs and Class members would not have purchased the Beech-Nut Products, or they would have paid less for such products.

190.    Plaintiffs and Class members were injured by their reliance on Defendant's misrepresentations, partial-truths, and omissions. Plaintiffs and Class members have been damaged because they purchased products that were unsafe for babies and not as represented, and, because of that deception have been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, pray for relief and judgment against Defendant as follows:

A.    Certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as representatives of the Class, and designating Plaintiffs' counsel as Class Counsel;

B.    Awarding Plaintiffs and the Class compensatory damages, in an amount exceeding $5,000,000, to be determined by proof;

C.    Awarding Plaintiffs and the Class appropriate relief, including actual and statutory damages;

D.    For punitive damages;

E.    For declaratory and equitable relief, including restitution and disgorgement;

F.    For an order enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

G.    Awarding Plaintiffs and the Class the costs of prosecuting this action, including expert witness fees;

H.    Awarding Plaintiffs and the Class reasonable attorneys' fees and costs as allowable by law;

I.    Awarding pre-judgment and post-judgment interest; and

J.    Granting any other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: July 9, 2021

**E. STEWART JONES HACKER MURPHY LLP**

By: _____

James E. Hacker, Esq.
   Bar Roll: 101888
Randolph Treece, Esq.
   Bar Roll: 102735
Julie A. Nociolo, Esq.
   Bar Roll: 519914
28 Second Street
Troy, NY 12180
Telephone: (518) 274-5820
Email:    jhacker@joneshacker.com
          rtreece@joneshacker.com
          jnociolo@joneshacker.com

Rosemary M. Rivas (*pro hac vice* forthcoming)
Mark Troutman* (*pro hac vice* forthcoming)
Rosanne L. Mah (*pro hac vice* forthcoming)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
Email: rmr@classlawgroup.com
*working from Ohio office

Christopher K. Leung (*pro hac vice* forthcoming)
Max E. Rodriguez (*pro hac vice* forthcoming)
Alison Borochoff-Porte (*pro hac vice* forthcoming)
**POLLOCK COHEN LLP**
60 Broad St., 24th Fl.
New York, NY 10004
Telephone: (917) 985-3995
Email: Chris@PollockCohen.com

*Attorneys for Plaintiffs and the Proposed*
*Class Members*